# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS ROBINSON, o/b/o D.R., | : | CASE NO. 3:13-cv-00332-RDM-GBC |
| | : | |
| Plaintiff, | : | (JUDGE MARIANI) |
| | : | |
| v. | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| CAROLYN W. COLVIN, | : | REPORT AND RECOMMENDATION TO |
| ACTING COMMISSIONER OF | : | DENY PLAINTIFF'S APPEAL |
| SOCIAL SECURITY, | : | |
| | : | Docs. 1,11,14,15,18 |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

### I. Procedural History

On April 30, 2010, Douglas Robinson, Jr., on behalf of his minor child D.R., ("Plaintiff")

filed an application for Supplemental Security Income benefits under Title XVI of the Social

Security Act. (Tr. 105-11).

This application was denied, and Plaintiff filed a request for hearing on July 8, 2010. (Tr.

91-94 (initial denial notice), 96 (request for hearing)). On June 6, 2011, a hearing was held before

an Administrative Law Judge ("ALJ") at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 33-62). On June 21, 2011, the ALJ issued a decision finding that Plaintiff was not disabled and thus was not entitled to benefits. (Tr. 12-32). On June 28, 2011, Plaintiff filed an appeal with the Appeals Council. (Tr. 10-11). On December 10, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On February 8, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1.

On April 18, 2013, Commissioner filed an answer and administrative transcript of proceedings. Docs. 10,11. In July and August, the parties filed briefs in support. Docs. 14,15,18. On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 13, 2014, the Court issued an order for Plaintiff to notify the Court as to whether briefing is complete and ready to submit for decision. Doc. 19. On May 14, 2014, Plaintiff notified the Court that the matter is ready for review. Doc. 20.

## II.    Background on Child Disability Cases

The law under which Plaintiff's case was adjudicated has undergone major changes since the United States Supreme Court's landmark decision in Sullivan v. Zebley, 493 U.S. 521(1990). Prior to Zebley, the Social Security Administration had followed a strictly medical test for childhood disability, under which it was impossible to qualify for such benefits unless the child's condition medically met or equalled the criteria contained in the Listing of Impairments, and under which consideration of functioning was expressly forbidden. Id. at 895 n.19. As the Supreme Court held,

those Listing criteria are set at a higher level of severity than was then required by the statutory standard of disability. For adults who do not meet or equal the Listing criteria, disability can be demonstrated if an individual's residual functional capacity is limited enough to preclude substantial gainful activity. As a result of the functional assessment commanded by Zebley and the regulations subsequently promulgated by the Commissioner (58 Fed. Reg. 47532-47587, Sept. 9, 1993), children who did not meet or equal the Listings could be found disabled on the basis that their impairments are of "comparable severity" to those which disable adults.

However, on August 22, 1996, Congress amended the Social Security Act to eliminate the prior statutory standard of "comparable severity" for childhood disability. P.L. 104-193, Aug. 22, 1996. Under the new statutory provisions, which are applicable to all claims pending on the date of enactment (including the case at bar), a disabled child must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(I).

The Commissioner has interpreted this new statutory provision in regulations promulgated on February 11, 1997; the new regulations provide a new sequential evaluation process for children. 20 C.F.R. §416.924. The new regulations provide that a child whose condition meets, medically equals, or functionally equals the criteria of a listed impairment must be found disabled; a child whose impairment(s) do not meet or equal (medically or functionally) the listing criteria contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 is not disabled. 20 C.F.R. § 416.924(a).

These regulations were again amended on September 11, 2000. 65 Fed. Reg. 54782 (Sept. 11, 2000) and Plaintiff's claim was evaluated under these criteria. Under these revised criteria, when

analyzing whether or not a claimant's impairments functionally meet a Listed impairment, the Commissioner considers the child's functionality in six domains. These domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for onself; and health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

In order to functionally equal one of the Commissioner's childhood Listing of Impairments, a child must exhibit either a "marked" limitation in two of the six domains, or an "extreme" limitation in any single domain. 20 C.F.R. § 416.926a(d). The Commissioner defines a "marked" limitation as one which interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2).

The Commissioner defines an "extreme" limitation as one which interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3).

Recently, the Commissioner issued several Social Security Rulings ("SSR") regarding childhood disability determinations. See generally SSR 09-lp, 2009 SSR LEXIS 1, at *30, 2009 WL 396031, at *13 (explaining how the agency determines childhood disability under the functional equivalence rule and cross-referencing SSRs 09-2p, 09-3p, 09-4p, 09-5p, 09-6p, 09-7p and 09-8p). Following the issuance of SSR 09-lp, the Commissioner issued separate rulings regarding each functional equivalence domain. Each of these rulings consolidates information from the Commissioner's regulations and sub-regulatory materials. See e.g, SSR 09-lp, 2009 SSR LEXIS 1, at *30, 2009 WL 396031 (explaining purpose of the ruling is to "provide [ ] policy interpretations and consolidate [ ] information from [the Commissioner's] regulations, training materials, and question-and-answer documents about [it's] 'whole child' approach for determining whether a child's impairment(s) functionally equals the listings"). For example, SSR 09-1p discusses the regulations governing childhood disability, including 20 C.F.R. §§ 416.924, 416.624a, 416.926a.

### III.    Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more

than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).

### IV. Relevant Facts in the Record

Plaintiff was born in February 2002 and was 11 years old on the date of the ALJ decision (Tr. 105, 12, 18). Because of Plaintiff's age, he is considered a "school age child" by the Commissioner's regulations (Tr. 18, Finding of Fact ("Finding") No. 1). 20 C.F.R. § 416.926a(g)(2).

### A. Medical Records

D.R. presented to psychologist Barbara Terrill-Kettering, Psy.D., on March 16, 2010 for a psychological consultation (Tr. 248-54). Although Dr. Kettering observed D.R. had oppositional and defiant difficulties, including stealing, temper tantrums, typical sibling rivalry, and spiteful and vindictive behaviors, resulting from his mother's arrest and incarceration, she also observed that D.R. was alert and fully oriented (Tr. 250-52). Dr. Kettering diagnosed D.R. with adjustment disorder with mixed disturbance of emotions and conduct, chronic; parent-child relational problems; and assessed a global assessment of function (GAF) score of 51, consistent with moderate symptoms (Tr. 252-53). In addition, Dr. Kettering recommended nothing more than conservative treatment of Behavioral Health Rehabilitation Services; involvement of D.R.'s parents, treatment staff, and educations; and a follow-up psychological evaluation (Tr. 253). No medication was prescribed (Tr. 253). The examination noted that despite tantrums, D.R. had good hygiene, good grooming, adequate response to questions, was coherent, and had logical and goal directed thought process (Tr. 252-53).

On June 8, 2010, state agency physician Paul Taren, Ph.D., indicated that D.R.'s impairments of adjustment disorder NOS and parent-child relational problems were severe, but did not meet or equal the listings (Tr. 255-56). Regarding the six domains of functioning, Dr. Taren indicated that D.R. had no limitation acquiring and using information; moving about and manipulating objects; and his health and physical well-being, and only less than a marked limitation attending and completing tasks; interacting and relating with others; and caring for himself (Tr. 257-58). Regarding interacting and relating with others, Dr. Taren stated that D.R.'s father informed the psychologist that D.R. "gets frequent informal reports from the school; there is no IEP or 504 service plan in place at this time; [D.R.] makes and keeps friends; [and has a] normal degree of sibling rivalry" (Tr. 257).

D.R. presented to psychologist Bonnie L. Whipple, Ph.D., for a psychological re-evaluation on July 6, 2010 (Tr. 265-71). Dr. Whipple's mental status examination reflected that D.R. was cooperative, he had a euthymic mood, congruent affect, good eye contact, fluent speech, full orientation, limited judgment, limited insight, limited impulse control, and no suicidal or homicidal ideation (Tr. 269). Dr. Whipple noted D.R. was "markedly restless and fidgeted in [his] seat" (Tr. 269). Dr. Whipple diagnosed D.R. with oppositional defiant disorder, depressive disorder not otherwise specified, parent-child relational problems; and assessed a GAF score of 51 (Tr. 270). Dr. Whipple recommended nothing more than mobile therapy ten hours per month, a psychiatric evaluation, and Summer Therapeutic Activities Program for thirty hours a week (Tr. 270-71).

In a treatment plan dated July 24, 2010, Brandy Thompson Fisher, LCSW, indicated that D.R. had good spatial abilities and building skills (Tr. 275). Ms. Fisher noted that the goal of therapy was to improve D.R.'s ability to follow rules and directions, his interactions with peers, coping skills, and learn to take responsibility for his behaviors (Tr. 273).

D.R. presented for a psychological evaluation with psychologist Robert J. Meacham, M.S., on November 30, 2010 (Tr. 297-304). At the time of the evaluation, D.R. did not have an IEP and was in regular education classes (Tr. 298). D.R.'s father reported that D.R. had average grades, did not exhibit hyperactivity, impulsivity, or inattentiveness, was well mannered, polite, considerate, and enjoyed leisure activities including sport, and family trips (Tr. 298). Dr. Meachem noted that D.R. had good eye contact, could sit in chair without difficulty, had no issues with verbal fluency, was cooperative, was fully oriented, and he denied depression, anger, sadness, or anxiety (Tr. 300). Dr. Meachem provided a similar diagnosis to that of Dr. Whipple four months prior, but noted an improved GAF score of 58 (Tr. 303). Dr. Meacham did not prescribe any psychotropic medications and mirrored Dr. Whipple's diagnosis (Tr. 303). An addendum to the psychological evaluation was provided in February 2011 to prescribe TSS services in school (Tr. 293-96). Diagnoses and GAF scores remained the same (Tr. 293-96).

### B. School Records

D.R.'s teacher, Ms. Heather McCarthy, completed a Child Function Questionnaire ("Questionnaire") on May 11, 2011 (Tr. 285-91). Regarding the domain of Acquiring and Using Information, Ms. McCarthy opined that D.R. has "marked" limitation in the following areas: following verbal instructions; demonstrating problem solving skills; comprehending written instructions; following instructions; Counting or spelling; and recognizing and using concepts. (Tr. 286). In support of these limitations, Ms. McCarthy stated that "[D.R.] has a difficult time processing information (at times). He needs several prompts and reminders about what he should be doing or what the directions are." Id. With respect to the domain of Interacting and Relating, Ms. McCarthy opined that D.R. has "marked" limitation in the following areas: getting along with other children;

getting along with authority figures; sharing/taking turns; being disruptive, talking out of turn; respecting authority/being disobedient; due to unprovoked hostility or anger; interacting appropriately with adults; and talking constantly, unable to stop talking. (Tr. 287). In support of these assessed limitations, Ms. McCarthy stated that "[D.R.] can be sweet and caring at times. However, the majority of the time, [D.R.] becomes disrespectful and defiant with or without reason. Some of the students are afraid of him." Id.

During his school years, D.R. has been suspended several times for offenses such as insubordination, fighting, and theft of a fellow student's property (Tr. 169-71, 237, 236). D.R.'s citizenship grades also suffered because of his problems getting along with fellow students and teachers (Tr. 165-68). His second grade teacher indicated that he needs constant direction and when that fails, "removal from the classroom, sitting by himself." (Tr. 154).

As a result of extensive psychological testing (Tr. 248-54, 265-71), [D.R.] was approved for 10 hours of mobile therapy per month and 30 hours of Therapeutic Support Services weekly in school (Tr. 231, 270). It should be noted that this level of intervention was believed by the school professionals who authored his IEP to be "beneficial for [D.R.] and will help us provide appropriate accommodations/strategies and keep [D.R.] in the regular education class/environment" (Tr. 231).

"Mrs. McCarthy states that D.R. is very capable. She feels his behaviors are holding him back academically" (Tr. 186); "Mrs. McCarthy reported that D.R.'s problems affect his functioning 'very frequently' in academic settings" (Tr. 189); "D.R. refuses to work with classroom helpers or paraprofessionals . . . during whole group instruction, D.R. is unfocused, he distracts others (calls out), and does not complete assignments. In small group settings, his behavior is the same as above. Mrs. McCarthy notes that even one-on-one, D.R. demonstrates inconsistent effort" (Tr. 185-86);

"When off-task, D.R. was talking out to other students (frequently), drawing on his paper, playing with his eraser, and playing with items in his desk" (Tr. 186); "Staff members working with D.R. do knot know how to help him or redirect him when he becomes oppositional or shuts down. Mrs. McCarthy notes that the following interventions have been attempted with D.R., but do not always impact his behavior in a positive way: Title I, iStation, reduced spelling lists, incentive charts, rewards, behavior contracts, one-on-one support, test accommodations (reading tests to him, D.R. reading his tests aloud) and Study Island" (Tr. 186); and as a result of the D.R.'s "depression, behaviors, low frustration tolerance level, he should continue to receive medically enhanced behavioral health services to include mobile therapy (10 hours a month) and TSS (25 hours a week)" (Tr. 187).

D.R.'s first grade individual diagnostic analysis indicated that he had below average overall performance in mathematics, however, D.R. improved by second grade with an average overall performance in mathematics that he maintained throughout the year (Tr. 162-64). D.R.'s second grade teacher completed a Teacher Questionnaire indicating that D.R. had only slight problems in acquiring and using information (Tr. 152). D.R. was only observed to have obvious and serious problems in half of the activities related to attending and completing tasks (Tr. 153). Although D.R. rushed through school assignments without rechecking his work, the teacher mentioned nothing about an inability to complete tasks (Tr. 153). Only three out of thirteen activities were noted to be obvious to serious problems regarding interacting and relating to others (Tr. 154). Those activities involved nothing more than following rules, playing cooperatively, and taking turns (Tr. 154). Minimal limitations were found in moving about and manipulating objects and caring for himself (Tr. 156).

School records from 2011 included an evaluation report regarding D.R.'s difficulty adjusting emotionally due to his mother's incarceration and his refusal to work with classroom helpers or paraprofessionals (Tr. 185). The same evaluation indicated that D.R. "is very capable [and that] his behaviors are holding him back academically" (Tr. 186). The Wechsler Intelligence Scale for Children, Fourth Edition assessed a verbal comprehension score of 98 (45th percentile), perceptual reasoning index score of 96 (39th percentile), and full scale IQ score of 95 (37th percentile) (Tr. 188). Those average scores indicate that D.R. "has adequate work knowledge, verbal reasoning skills, visual-spatial skills, and fluid reasoning skills" (Tr. 188). Although D.R. received a low average score of 80 (9th percentile) in Working Memory, he received a high average score of 112 (79th percentile) on the Processing Speed Index on the WISC-IV assessment (Tr. 188). In addition, D.R.'s scores on the Wechsler Individual Achievement Test, Third Edition, yielded mostly average scores (Tr. 188). Based on the aforementioned scores, D.R. was neither mentally retarded nor had a learning disability (Tr. 194). Rather, D.R. had average cognitive abilities (Tr. 194).

### C. ALJ Finding

The ALJ found that Plaintiff suffers from "severe" Oppositional Defiant Disorder ("ODD"), Depressive Disorder, Adjustment Disorder, Parent-Child Relational Problems, and a Learning Disability. (Tr. 18). The ALJ further found that Plaintiff's impairments do not meet or medically equal the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id., Finding 4. With respect to functional equivalence, the ALJ made the following findings in the functional domains: acquiring and using information: less than marked limitation; attending and completing tasks: marked limitation; interacting and relating with others: less than marked limitation; moving about and manipulating objects: no limitation; caring for onself: less than marked limitation; health and

physical well-being: no limitation (Tr. 19-30, Finding 5). Thus, this case was denied at Step Three of the Commissioner's childhood sequential evaluation (Tr. 30, Finding 6).

## V.     Review of ALJ Decision

For a child under age 18 to be entitled to SSI benefits, he must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(c)(I). The Acting Commissioner's rules for evaluating childhood disability follow a three-step sequential evaluation process, under which the Acting Commissioner will consider: (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. 20 C.F.R. § 416.924.

A child functionally equals a listing when his impairment is of listing level severity, i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The six domains of functioning used in determining functional equivalence are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A marked limitation in a domain is found when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A marked limitation is more than moderate but less than extreme. Id. An extreme limitation in a domain is found when the impairment interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

When reviewing whether substantial evidence supports that ALJ's decision that D.R.'s impairments did not functionally equal a listing, the Court considers examples of impairments that do functionally equal a listing. The regulations list eight such examples: 1) documented need for an organ transplant; 2) an impairment requiring a series of life-saving surgeries within a 12 month period; 3) effective ambulation possible only with obligatory bilateral upper limb assistance; 4) any physical impairment(s) or combination of physical and mental impairments causing complete inability to function independently outside of one's home; 5) a requirement of 24-hour a day supervision for medical, including psychological, reasons; 6) infants weighing less than 1200 grams at birth until one year of age; 7) infants weighing at least 1200 grams at birth who are small for gestational age; and 8) major congenital organ dysfunction expected to result in death in the first year of life without surgery. 20 C.F.R. § 416.926a(m).

### A.   Plaintiff Allegations of Error

#### 1.   ALJ Rejection of Teacher Opinion

Plaintiff first argues the ALJ erred in failing to credit the opinion of Plaintiff's teacher. "A Child Functioning Questionnaire signed by a Heather McCarthy in May 2011 checks off items under the heading 'often (marked),' in all domains other than Moving and Manipulating Objects and Caring for Health and Well being. The [ALJ] gives no weight to this assessment, as it is not consistent with the evidence of record, and provides minimal explanation or support for the check mark. Further, the minimal description of marked which Ms. McCarthy relies upon does not coincide with the definition of 'marked limitation' provided by Social Security regulation. 20 CFR 416.926a(e)(2). (Tr. 22-23)."

"The ALJ's duty to adequately explain the weight given to the opinions of treating physicians also extends to opinions from 'other sources,' especially where those sources may have greater

knowledge than a physician about the plaintiff's functioning over time. See Ruth v. Astrue, No. 09–2074, 2011 WL 2135672, at *13 (E.D. Pa. May 31, 2011) (finding the ALJ erred in crediting the opinion of a treating physician without adequately discussing a questionnaire provided by a teacher who had known plaintiff for four years). In this case, the ALJ explained the rationale for rejecting the McCarthy Questionnaire, and there is no evidence Ms. McCarthy knew D.R. for four years, as in Ruth.

A teacher is not an acceptable medical source and, thus, her opinion is not entitled to any significant weight. 20 C.F.R. § 416.913. Notably, even if a teacher could somehow be accorded the same weight as a doctor, a doctor's opinion can never bind the Acting Commissioner on the issues reserved to the Acting Commissioner. 20 C.F.R. § 416.927(e)(1)-(3); SSR 96-5p, 1996 WL 374183 (S.S.A.). Thus, a teacher's attempt to rate the severity of a child's functional limitations using the Agency's functional equivalence terms is not entitled to any significant weight because it speaks on an issue reserved to the Acting Commissioner.

A review of the ALJ's decision reveals that he adequately considered the relevant medical and school evidence from D.R.'s teachers and provided legitimate reasons why he declined to adopt Ms. McCarthy's opinion. The regulations provide that the Commissioner may consider evidence from teachers, and other sources that are not-acceptable medical sources, to determine the severity of an impairment and how the claimant typically functions compared to children of the same age who do not have impairments. See 20 C.F.R. § 416.913(d)(2); see also 20 C.F.R. § 416.924a(a)(7)(ii) ("If you go to school or preschool, we will ask your teacher(s) about your performance in your activities throughout your school day. We will consider all evidence we receive from your school, including teacher questionnaires, teacher checklists, group achievement testing, and report cards.").

The ALJ noted D.R.'s teachers' opinions were entitled to no weight because they were

unsupported by any specific details and because their assessed limitations were inconsistent with the overall medical record and D.R.'s daily activities (Tr. 22). See 20 C.F.R. § 416.927(d)(4) (stating that the more consistent an opinion is with the record as a whole, the more weight will be given to that opinion). The ALJ noted there is no indication that D.R. is not accomplishing age appropriate activities, no indication that he had any limitations in his ability to take care of himself or tend to his personal care and his hygiene was routinely described as good (Tr. 253, 269, 298). The ALJ accounted for Ms. McCarthy's opinion of marked limitations in attending and completing tasks and found the same (Tr. 26).

Plaintiff contends the ALJ improperly rejected Ms. McCarthy's Questionnaire for "provid[ing] minimal explanation or support for the check mark." However, the ALJ was correct in asserting that the narrative response did not correspond with the subject at hand. While describing caring for self, Ms. McCarthy wrote that D.R.'s "moods change frequently without a cause. He goes from being okay, to angry, to hugging someone. When things don't go as he wants them to he becomes frustrated and distracts others in any way he can think of." (Tr. 289). Such a response fails to address an ability to handle personal care, maintain proper hygiene, diet, etc., and the ALJ properly gave it no weight.

## 2.    ALJ Found Less Than "Marked" Limitation in Acquiring and Using Information

Plaintiff next argues the ALJ erred by finding less than "marked" limitation in the domain of Acquiring and Using Information. Ms. McCarthy said D.R. demonstrates "marked" limitations in several areas key to Acquiring and Using Information.

The domain of acquiring and using information focuses on how well the child has acquired information and uses what he has learned. This domain involves how well children perceive, think about, remember, and use information in all settings, which include daily activities at home, at

school, and in the community. 20 C.F.R. § 416.926a(g) and SSR 09-3p. (Tr. 24). The ALJ cited the examples of limited functioning in this domain that were not age-specific, including a lack of understanding of words about space, size, or time; the inability to rhyme words or the sounds in words; difficulty recalling important things learned in school one day earlier and solving mathematics questions or computing arithmetic answers; and talking only in short, simple sentences with difficulty explaining what you mean. 20 C.F.R. § 416.926a(g)(3)(i)-(v). (Tr. 24).

The ALJ found a "less than marked" limitation in this domain stating "[D.R.] now has an IEP and receives services including a mobile therapist and TSS worker. Educational records indicate that he is very capable but needs redirection and that his behavior was holding him back academically. Nevertheless, he has not repeated any grades; his father does not indicate he has failed any subjects; IQ testing indicates average cognitive abilities; and he is receiving special education services based in large part upon emotional disturbances. There is no indication that he is not progressing in school with his IEP, which provides for learning support and emotional support related services. Claimant's GAF scores have been routinely indicative of moderate symptoms and limitations, which is consistent with the record. With the commencement of medication Prozac, his behavior has improved, his father indicates that he is calmer, and calls from school related to his behavior have decreased. Treatment for his ODD, depressive disorder and adjustment disorder do not cause mental limitations in this domain." (Tr. 25).

The ALJ pointed to D.R.'s Wechsler Intelligence Scale for Children, Fourth Edition verbal comprehension score of 98, perceptual reasoning index score of 96, and full scale IQ score of 95 which was in the low average range; it fell within one standard deviation of the mean -- the mean is 100 with a standard deviation of 15, as set forth in the teacher evaluation report (Tr. 188). As the ALJ noted, not only did IQ testing outline an individual with average cognitive abilities, but second

grade evaluations indicated D.R. had an average overall performance in mathematics, and D.R.'s father testified that he had average grades (Tr. 163-64, 188, 298).

The ALJ noted that in an undated child function report from age 6 to 12, D.R.'s father indicated that D.R. had no limitations communicating with family and friends or using sentences with "because," "what if," or "should have been" (Tr. 20,132). D.R.'s father stated that D.R.'s ability to progress in learning was limited in only four out of fourteen activities including, but not limited to, reading and understanding stories (Tr. 20,133). Although D.R.'s interactions with others limited his participation in team sports, he had friends his own age, could make new friends, and generally got along with family, teachers, and other adults (Tr. 20,135). D.R. also had no physical limitations. Id. D.R. had minimal limitations handling her personal care (Tr. 20,136). Although D.R. had difficulty paying attention enough to complete homework and chores, he was able to keep busy on his own, finish things he started, and work on arts and crafts projects (Tr. 20,137).

The ALJ noted that in the teacher questionnaire completed by D.R.'s second grade teacher, only slight problems were noted in Acquiring and Using Information explaining that he is off task a lot and need directions. (Tr. 20,152). The ALJ also noted that "[t]he State agency medical consultant's Child Disability Evaluation form assigns no limitation in Acquiring and Using Information." (Tr. 21,257).

Controlling regulations provide that state agency medical consultants "are highly qualified physicians . . . [and] experts in Social Security disability evaluation," whose opinions ALJs "must consider. . . . as opinion evidence[.]" 20 C.F.R. § 416.927(f)(2)(I). See, e.g., Chandler v. Comm'r of Soc. Sec., 2011 WL 6062067, at *3 (3d Cir. Dec. 7, 2011) (under the Commissioner's regulations, opinions of non-examining state agency physicians "merit significant consideration"); Mertz v. Astrue, 2011 WL 1659422, at *8 (S.D. Ohio Mar. 29, 2011); Social Security Ruling (SSR) 96-6p.

The ALJ considered the state agency expert opinion evidence, found it consistent with the record as a whole, and afforded it significant weight (Tr. 24).

Based on this analysis, substantial evidence supported the ALJ's decision that D.R. has less than marked limitations in the domain of functioning of Acquiring and Using Information. (Tr. 25).

### 3. ALJ Found Less Than "Marked" Limitation in Interacting and Relating to Others

Plaintiff next argues the ALJ erred by finding less than "marked" limitation in the domain of Interacting and Relating to Others. Ms. McCarthy indicated that several areas of functioning in this domain are at a "marked" level of limitation.

This domain considers how well a child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). When considering a child's ability to interact and relate with others, the regulations explain that a school-aged child without an impairment should be able to develop more lasting friendships, understand how to work in groups, have an increasing ability to understand another's point of view, and be able to talk to people of all ages. 20 C.F.R. § 416.926a(i)(2)(iv). (Tr. 26).

The ALJ cited examples of limited functioning in this domain that do not necessarily describe "marked" or "extreme" limitation: "(i) does not reach out to be picked up and held by caregiver; (ii) has no close friends, or all friends are older or younger than the child; (iii) avoids or withdraws from people he knows, or is overly anxious or fearful of meeting new people or trying new experiences; (iv) has difficulty playing games or sports with rules; (v) has difficulty communicating with others (e.g., in using verbal and nonverbal skills to express himself, in carrying on a conversation, or in asking others for assistance); or (vi) has difficulty speaking intelligibly or with adequate fluency."

(Tr. 27).

The ALJ found a "less than marked" limitation in this domain stating, "Claimant states he has friends, plays kickball and plays in the park. The evidence indicates that he has engaged in confrontational behavior with peers, authority and his father when he does not get his own way. Claimant prefers solitary activities at times, has temper tantrums, at times seeks control by engaging in verbal arguments with adults, and has problems with peers who tease him about his mother (Exhibit 4F). Nevertheless the evidence indicates that he has some friends, can make friends, has typical sibling rivalry, can get along with his father, and that his anger is directed toward his mother who is absent because of incarceration. He has been described by his father as well-mannered, polite and considerate. Others have observed him as having a charismatic personality, able to make and keep friends, having typical sibling rivalry, and able to make good eye contact. It was reported that claimant plays outdoor with friends, enjoys kickball and football, likes to play video games and watch TV." (Tr. 27).

The ALJ acknowledged D.R. had limitations in this area, however, the record did not support a finding that D.R. had a marked limitation in this domain (Tr. 26-27). As explained above, a marked limitation means that the impairment interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities; it is the rating the agency assigns to the "worst" limitations. See 20 C.F.R. § 416.926a(e)(3)(I).

The ALJ noted that in the teacher questionnaire completed by D.R.'s second grade teacher, in Interacting and Relating to Others, only 3 of 13 activities were described as obvious to serious problems and dealt with following rules, playing cooperatively and taking turns. Almost all of his conversation is known to others. (Tr. 20,152). The ALJ also noted that "[t]he State agency medical

consultant's Child Disability Evaluation form assigns "less than marked" limitations in Interacting and Relating to Others." (Tr. 21,257).

In <u>Royer ex rel. Royer v. Astrue</u>,"the ALJ found at step 2 that [plaintiff] suffers from the severe impairments of a learning disorder, an oppositional defiant disorder, and a history of bilateral club feet status post surgical repair with associated degenerative joint disease. However, after reviewing [plaintiff's] medical records, school records, and teacher/counselor questionnaires, and considering the testimony of both [plaintiff] and his father, the ALJ found that those impairments, alone or in combination, do not meet or medically equal the severity of any of the impairments listed in Appendix 1 of 20 C.F.R., Part 404, Subpart P, nor do they result in limitations that functionally equal the listings. As a result, the ALJ found at step 3 that [plaintiff] is not disabled within the meaning of the Act." <u>Royer ex rel. Royer</u>, 2012 WL 1032486, at *1 (W.D. Pa. Mar. 27, 2012). Similarly in this case, the ALJ reviewed the evidence and found that Plaintiff did not meet the criteria for child disability.

Based on this analysis, substantial evidence supported the ALJ's decision that D.R. has less than marked limitations in the domain of functioning of Interacting and Relating to Others. (Tr. 26-27).

## VI.    Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; <u>Brown</u>, 845 F.2d at 1213; <u>Johnson</u>, 529 F.3d at 200; <u>Pierce</u>, 487 U.S. at 552; <u>Hartranft</u>, 181 F.3d at 360; <u>Plummer</u>, 186 F.3d at 427; <u>Jones</u>, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190.

Accordingly, it is HEREBY RECOMMENDED:

1.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

2.      The Clerk of Court shall CLOSE the case.


The parties are further placed on notice that pursuant to Local Rule 72.3: Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before

the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: July 29, 2014

s/Gerald B. Cohn
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE